UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| IN RE: VIOXX | : | MDL NO. 1657 |
| PRODUCTS LIABILITY LITIGATION | : | SECTION: L |
|  | : |  |
|  | : | JUDGE FALLON |
|  | : | MAG. JUDGE KNOWLES |

**THIS DOCUMENT RELATES TO ALL CASES**

### ORDER AND REASONS

On June 29, 2005, the Court heard oral argument on Plaintiffs' Motion to Modify the Court's June 6, 2005 Order and Reasons. For the following reasons, the Plaintiffs' motion is GRANTED and the Court's June 6, 2005 Order and Reasons is modified to apply to the Plaintiffs in circumstances where the prescribing physician has been named as a defendant.

I.      Plaintiffs' Motion to Modify

In an Order issued June 6, 2005, this Court ruled that any attorney or representative of any party wishing to interview a Plaintiff's prescribing physicians must serve Liaison Counsel for the opposing party with five days notice of such interview. According to the Order, opposing counsel would then be permitted to attend and participate in the noticed interview, but if opposing counsel decided not to participate in the interview, the noticing party could conduct said interview without opposing counsel's presence. The Plaintiffs have moved the Court to modify this Order by limiting the applicability of the Order as it applies to Plaintiffs' counsel to circumstances in which the treating physician actually has been named as a defendant. Plaintiffs

-1-

EXHIBIT 2

seek this modification for several reasons:

First they argue that the Court's order is unprecedented and inconsistent with practice in other major venues of the Vioxx litigation. The Plaintiffs point to other MDLs as well as Vioxx litigation in various states in which courts have allowed Plaintiffs' counsel to contact treating physicians without the presence of defense counsel.

Second, Plaintiffs suggest that the Court's decision has discouraged participation in the MDL.

Third, Plaintiffs argue that the Court's concern about Plaintiffs' contact with physicians who are potential defendants is not needed because there is no evidence of impropriety on the part of Plaintiffs' counsel with regard to communications with physicians. The Plaintiffs further state that amendments to add physicians are unlikely because the Plaintiffs' main theory is that doctors were never allowed to become learned intermediaries since Merck failed to disclose known risks of heart attacks to the medical community. Therefore, adding doctors as defendants in most circumstances would undermine this theory by suggesting that the doctors are at fault. Accordingly, the Plaintiffs believe that the Court's June 6, 2005 Order should be modified to conform with the Court's policy reasons for denying the ex parte communications for any party, and only should apply to the Plaintiffs where the treating physician has an interest in the litigation because he or she has been named as a defendant.

Merck opposes such modification, claiming that the Plaintiffs have used the motion for reconsideration to rehash previous arguments. Merck argues that the Court's concerns regarding Plaintiffs' communications with doctors is not unfounded. To support this position, Merck points to a letter in which a plaintiffs' lawyer threatened to name doctors as defendants in Vioxx

suits and to tell the doctors that it was Merck's fault because Merck refused to waive its right to remove Vioxx cases to federal court. Further, Merck points to a plaintiffs' attorney working for a firm represented on the PSC who, at a Vioxx conference, encouraged other plaintiffs' lawyers to sway physicians to accept plaintiffs' theories in Vioxx cases. Merck questions why Plaintiffs cannot obtain factual information from doctors in the presence of a defense attorney. According to Merck, the real concern regarding undue influence is with physicians who have not already been sued, because those who have been sued will be represented by counsel. Further, Merck argues that the Court should not skew the law in order to encourage more federal court filings, as Merck believes the Plaintiffs are advocating.

After considering the briefs and arguments of counsel the Court revisits its prior ruling and tests its theoretical basis, its basis in logic, and its practical effect.

II.  <u>Analysis</u>

A motion to reconsider should be granted only where the movant demonstrates: (1) intervening change in controlling law, (2) the availability of new evidence not previously available, or (3) the need to correct a clear error of law or to prevent injustice.[1] "Reconsideration of an order is an extraordinary remedy which courts should use sparingly."[2] Further, motions for reconsideration are not to be used "to re-debate the merits of a particular

---

[1] *Freeport-McMoran Sulphur LLC v. Mike Mullen Energy Equip. Resource, Inc.*, 2004 U.S. Dist. LEXIS 12183, *4 (E.D. La. June 30, 2004), citing *Motiva Enters. LLC v. Wegmann*, 2001 U.S. Dist. LEXIS 3049 (E.D. La. Mar. 12, 2001).

[2] *Schildkrant v. Bally's Casino New Orleans, LLC*, 2004 U.S. Dist. LEXIS 21412, *1 (E.D. La. Oct. 20, 2004).

-3-

motion."[3]

In the instant case, the Plaintiffs have not satisfied requisites (1) or (2) of the standard for motions to reconsider. However, the Plaintiffs have claimed that the Court's order should be modified to prevent injustice. Therefore, the Plaintiffs have filed a valid motion for reconsideration. In fact, the Plaintiffs have characterized their motion as a motion to modify rather than a motion for reconsideration because the Plaintiffs have not taken issue with the Court's reasoning. Rather, the Plaintiffs argue that the Court's reasoning need not lead to such a broad prohibition against Plaintiffs' contacts with their own prescribing physicians.

At the outset, the Court's notes that the purpose of the June 6, 2005 opinion and order was to put Plaintiffs and Defendants on an equal footing with respect to interviewing the prescribing physicians. While the logic and reasoning of the opinion are sound, the practical effect has created unintended consequences that can cause more problems than it sought to solve. This is of concern and causes the Court to reevaluate its prior approach.

It is important to recognize that the current issue is a discovery issue and not a substantive one. Discovery is intended to assist counsel for all parties to prepare for trial. It is not intended to make life more difficult or to distract them from the primary issues of the litigation. If or when it does, the discovery method needs to be reevaluated. This observation is not intended to trivialize discovery; it is an essential part of a case, but it has to be kept in perspective.

With this principle in mind, the Court turns to the issues raised by the Plaintiffs.

---

[3] *Freeport-McMoran Sulphur LLC,* 2004 U.S. Dist. LEXIS 12183 at *4; *see also Schildkraut,* 2004 U.S. Dist. LEXIS 21412 at *2.

-4-

Plaintiffs point out that in determining whether to take or keep a case, it is often important for a plaintiff's counsel to interview the plaintiff's treating physician regarding the plaintiff's personal medical history. The approach taken in the Court's previous Order presents an obstacle to this important process. Furthermore, the Court's initial approach has had a chilling effect on the MDL process, which was designed to coordinate litigation in one forum. While an adverse effect on the MDL process should not be determinative in the Court's decision on how to handle communications with physicians, it is not an irrelevant issue for MDL transferee judges. The Court's original approach has also interfered with the objective of the MDL process by placing Plaintiffs' counsel in a potential malpractice conundrum. Plaintiffs' counsel has to choose between filing their clients' cases in this MDL where they could not engage in private discussions with the plaintiff's treating physician, filing their cases in state courts that would allow them to have ex parte communications with the physicians, or first filing in state court in order to interview doctors and then removing to federal court and becoming part of the MDL. The effects of these decisions would leave the MDL with cases where some physicians previously have undergone interviews with Plaintiffs' counsel while others have not and now cannot. Clearly these unintended consequences can have a destructive effect on the efficient handling of this litigation and become problematic to both sides as well as to the Court. Another approach is called for.

One option would be to allow both sides to have unfettered ex parte access to the Plaintiffs' treating physicians. The advantage of this approach is that it too treats each side the same. Furthermore, the Defendants make the argument that the treating physicians in this case are really fact witnesses and both sides should have equal access to fact witnesses for ex parte

conferences. The treating physicians in this case are in a different role than the treating physician in a typical personal injury case. In a typical tort or product liability case the physician has had no contact or had nothing to do with the event that allegedly caused the claimed injury. In the present case, however, the treating physician does play a role in the event complained of by the Plaintiffs. Specifically, the physician is the one who prescribed the medication that allegedly caused the Plaintiffs' injuries and resultant damages.

At first blush, the treating physicians in this case seem more like "fact" witnesses than expert witnesses. On closer scrutiny, however, it is clear that the physicians are both fact and expert witnesses. However, with regard to the former, the "facts" that the treating physician has knowledge of were discovered during the time of a private, privileged relationship. To release this information without the approval of the patient, other than in a deposition or pursuant to a court order, would be in direct conflict with the time honored doctor-patient confidential relationship which has been recognized and protected in both Western and Eastern civilization for over 2000 years.

The special relationship which exists-and some would insist, must exist- between a patient and his or her doctor was first recognized by Hippocrates of Cos in the fifth century B.C. and is codified in the Hippocratic oath. The classical version of the Hippocratic Oath reads in pertinent part: "What I may see or hear in the course of the treatment or even outside of the treatment in regard to the life of men, which on no account one must spread abroad, I will keep to myself, holding such things shameful to be spoken about."[4] The principles set forth in the

---

[4] Translation from the Greek by Ludwig Edelstein, *From The Hippocratic Oath: Text, Translation, and Interpretation* (Johns Hopkins Press, 1943).

ancient Hippocratic Oath were formally introduced to modern Western society in 1803 with Thomas Percival's publication of *Medical Ethics*.[5] The American Medical Association ("AMA") adopted Percival's precepts in 1847 in its first Code of Ethics.[6] The modern AMA rule, promulgated by the AMA's Council on Ethical and Judicial Affairs in 1998, states that "information disclosed to a physician during the course of the relationship between physician and patient is confidential to the greatest possible degree."[7] Today, most graduates of medical schools in this country recite a modern version of the Hippocratic Oath upon matriculation.[8]

The importance of the physician-patient relationship is not limited to Western medicine. An Oath of Initiation, required of practitioners of Ayurvedic medicine in India since the fifth century B.C., stresses confidentiality of the physician-patient relationship as well.[9] In China, Sun Ssu-Miao, a pioneer of Chinese medicine, authored the "Thousand Golden Remedies" in the seventh century A.D.[10] The text outlines the decorum and discretion required of physicians, especially with regard to their dealings with patients. The physician-patient relationship is also

---

[5] John W. Clark, *Confidential Communications in a Professional Context: Attorney, Physician, and Social Worker*, 24 J. Legal Prof. 79, 91 (Spring 2000).

[6] *Id.*

[7] *Id.* at 92, citing Council on Ethical and Judicial Affairs, Am. Medical Ass'n, Code of Medical Ethics: Current Opinions with Annotations VII, Rule 5.05 (1998).

[8] The modern version of the Hippocratic Oath, as modified in 1946 by Louis Lasagna, Academic Dean of the School of Medicine at Tufts University, reads in pertinent part: "I will respect the privacy of my patients, for their problems are not disclosed to me that the world may know."

[9] V. Balakrishna Panicker, et al., *Indian Contributions to Science*, Swadeshi Science Movement, pp. 8-9 (2002); *see also* Clark at 90-91 n.76.

[10] *See id.* at 91 n.78; *see also* T'ao Lee, *Medical Ethics in Ancient China*, Bulletin of the History of Medicine 13, pp. 268-77 (1943).

described in the Oath of Asaph, required of practitioners of Hebrew medicine since approximately the sixth century A.D.[11] In particular, the Oath of Asaph requires physicians to "not divulge the secret of a man who has trusted you."[12]

The physician-patient privilege has transfigured from a code of ethics into a matter of law in most states in this Union. In 1776, the English case of Elizabeth, Duchess of Kingston, established that the physician-patient privilege did not exist as a matter of English common law.[13] However, in 1828, New York passed a statute codifying the physician-patient privilege.[14] Forty states and the District of Columbia have since similarly codified the physician-patient privilege.[15]

The ethical rules and attendant laws regarding the relationship between a physician and a patient serve both utilitarian and fairness purposes. Confidentiality reduces the stigma attached to seeking treatment for some infectious diseases and invites patients to provide information about previous ailments with greater candor.[16] This effect allows physicians to provide more

---

[11] *See* Clark at 91 n.77.

[12] Shlomo Pines, *The Oath of Asaph the Physician and Yohanan Ben Zabda: Its Relation to the Hippocratic Oath and the Doctrina Duarum Viarum of the Didache*, Proceedings of the Israel Academy of Sciences and Humanitis 9, pp. 223-264 (1975).

[13] *Rex. v. Duchess of Kingston*, 20 How. St. Tr. 355, 572-73 (1776).

[14] Daniel W. Shuman, *The Origins of the Physician-Patient Privilege and Professional Secret*, 39 Sw. L.J. 661, 676 (June 1985) citing N.Y. Rev. Stat. 1829 II, 406, part III, tit. 3, ch. VII, art. VIII, § 79.

[15] Shuman at 677.

[16] *Developments in the Law – Privileged Communications*, 98 Harv. L. Rev. 1530, 1532-33 (May 1985).

-8-

thorough preventative care. Moreover, because "[a]lmost every member of the public is aware of the promise of discretion contained in the Hippocratic Oath, [] every patient has a right to rely upon this warranty of silence."[17] Impairing the relationship between a physician and a patient would therefore not only be unfair to patients that have provided information to their physicians in confidence, but could reduce the quality of medical care provided.

In this litigation, the information imparted to the physicians by the Plaintiffs was given to the doctors while they were in the course of their well-established confidential relationship with the Plaintiffs. Therefore, this confidential relationship and the effect that counsels' communications would have on that relationship are very relevant concerns for the Court in fashioning appropriate guidelines for communications with the Plaintiffs' prescribing physicians. The Court also has to consider the Health Insurance Portability and Accessibility Act of 1996, 42 U.S.C. §1320d, et seq. ("HIPAA"), which is intended to "ensure the integrity and confidentiality of [patients'] information" and to protect against "unauthorized uses or disclosures of the information."[18] Further, this MDL case involves the separate laws of fifty states, some of which provide for a broader physician-patient privilege than others. The Court realizes that the physicians in this litigation are in a different position than in the typical personal injury case. This peculiarity, however, does not justify destroying the physician-patient relationship and all of the concerns that arise because of that relationship.

The Court, upon further reflection, now feels that the just option in this case is to protect the relationship between a doctor and patient by restricting defendants from conducting ex parte

---

[17]*Hammonds v. Aetna Cas. & Sur. Co.*, 243 F.Supp. 793, 801 (N.D. Ohio 1965).

[18] 42 U.S.C. §1320d-2(d)(2)(A) & (B)(ii).

communications with Plaintiffs' treating physicians but allowing Plaintiffs' counsel to engage in ex parte interviews with those doctors who have not been named as defendants. This approach appears, at first glance, to be one sided and unfair. However, in actuality and as a practical matter, it is not. This modification does not leave the Defendants without any access to information. The Defendants still are entitled to all of the medical records of the Plaintiffs as well as the Plaintiff Profile Forms setting forth each Plaintiff's detailed medical history. The Defendants can also continue to exercise their right to depose the Plaintiffs' treating physicians or confer with them in the presence of Plaintiffs' counsel. Furthermore, as a practical matter, the Defendants already have information, including documentation, regarding what its representatives told the treating physicians about Vioxx. Therefore, the Defendants do not need the doctors to tell them in ex parte conferences what they already know.

III.    Conclusion

For the aforementioned reasons, IT IS ORDERED that the Court's June 6, 2005 Order and Reasons be modified with respect to the Plaintiffs to apply only to circumstances where the prescribing physician has been named as a defendant. As the Court mentioned at oral argument, this modification is not set in stone. If future progress of this litigation indicates any trend toward the improper use of ex parte communications with physicians, the Court will revisit this issue.

New Orleans, Louisiana, this __21st__ day of __July__, 2005.

*[signature]*
UNITED STATES DISTRICT JUDGE